**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

| | |
|---|---|
| **EMMERICH NEWSPAPER, INC.,** ) | **Case No.: 5:24-cv-87-KS-BWR** |
| ) | |
| **and** ) | |
| ) | |
| **HOWARD JONES,** ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| **v.** ) | |
| ) | |
| **THE MISSISSIPPI RIVER** ) | |
| **COMMISSION,** ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

<u>**FIRST AMENDED COMPLAINT**</u>

Plaintiffs Emmerich Newspapers, Inc. and Howard Jones (collectively, "Plaintiffs"), submit this their First Amended Complaint against Defendant The Mississippi River Commission (hereinafter, "Defendant" or "MRC") and state the following:

**I.    INTRODUCTION**

1.      The Government in the Sunshine Act ("Sunshine Act") sets forth the United States' policies regarding transparency in the operations of the federal government. The Sunshine Act declares that "the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government." Pub. L. No. 94-409 § 2, 90 Stat. 1241 (1976) (codified at 5 U.S.C. § 552b note).  "Absent special circumstances, there is no reason why the public should not have the right to observe the agency decision making process first-hand." H.R. Rep. No. 94–880, pt. 1, at 2 (1976).  Accordingly, it is the law that "***every portion of every***

1

_**meeting of an agency shall be open to public observation**_," subject to certain exceptions not relevant to this case. 5 U.S.C. § 552b(c) (emphasis added).

2.      Both the House and Senate Reports that accompany the Sunshine Act specifically identified the Mississippi River Commission, further described below, as one of the agencies the Sunshine Act covers.  *See* S. Rep. No. 94-354, at 15 (1975); H.R. Rep. 94-880(II), at 2223 (1976).

3.      The Department of Defense, Army Corps of Engineers promulgated a proposed rule governing the MRC and "Public Observation of Commission Meetings" in accordance with the Sunshine Act.  Public notice of these proposed regulations was provided in the Federal Register on January 12, 1977 (42 Fed. Reg. 2572) and final regulations were adopted February 28, 1977 (42 F.R. 13286), to be effective March 12, 1977 and codified at 33 C.F. R. § 209.50.

4.      During the public comment period on these proposed regulations, which ran until February 14, 1977, Congressman Richardson Preyer, then Chairman of the Subcommittee on Government Information and Individual Rights, House Committee on Government Operations, submitted comments which resulted in adding the following sentence to Section 209.50(d)(1), stressing the importance of open meetings to news media and persons with an interest in the Commissions' work:

> Public announcements of Commission meetings shall include releases to the news media in the Lower Mississippi River Valley and mailing notices of such meetings to all persons and agencies known to have an interest in the Commission's work and to others who request such information.  [42 F.R. 13286]

5.      The MRC's regulations implementing the Sunshine Act provide: "The purpose of this regulation is to afford to the public, to the fullest possible extent, information regarding the decisionmaking processes of the Mississippi River Commission and to open all meetings of the Mississippi River Commission to public observation except in instances where a portion or portions of a meeting may be closed to the public in accordance with this regulation in order to

protect the rights of individuals and/or in order to permit the Mississippi River Commission to carry out its statutory and assigned functions and responsibilities." 33 C.F.R. 209.50(a)(1). The subsequent regulations provide narrow circumstances, not relevant to this Amended Complaint, under which MRC meetings may be closed, and the procedures to be followed when closing such meetings.

6.      The Federal Advisory Committee Act ("FACA"), now codified at 5 U.S.C. §§ 1001 (*et seq.*), requires that federal advisory committees conduct their business openly and transparently, with public notice of and access to meetings, along with related record keeping requirements. Under FACA, advisory committee meetings must be open to the public and may only be closed under the narrow exceptions that are provided by the Sunshine Act. 5 U.S.C. § 1009 (d).

7.      As a practical matter, for purposes of this action, the notice and open meeting requirements and related procedures under both the Sunshine Act and FACA are comparable, and for the same reasons that the MRC has violated the public notice, access, and record-keeping requirements of the Sunshine Act, it has also violated those requirements of FACA.

8.      For many years, and at least since 2010, the MRC has violated the Sunshine Act, FACA, and its own regulations by holding secret, non-public meetings as a matter of routine. In these secret, non-public meetings, the MRC has received information in the nature of formal presentations and briefings, discussed and considered that information, and made decisions associated with the management of the Mississippi River. Because these meetings have been conducted in secret, the public has been entirely unaware of the information that has been considered by the MRC or the bases for the MRC's decisions. Neither the fact of these meetings, nor the contents of the meetings, nor the nature of any discussions related to issues considered by

the MRC, has been publicly disclosed or open to public observation as required by law and regulation.

9.      Count 1 is brought under 5 U.S.C. § 552b(h)(1) of the Sunshine Act seeking declaratory judgment, injunctive relief, and other relief as may be appropriate, all to require the MRC to comply with the provisions of the Sunshine Act and remedy its non-compliance.

10.     Count 2 is brought under the FACA, which incorporates by reference the transparency requirements of the Sunshine Act, the Mandamus and Venue Act of 1962, 28 U.S.C. §§ 1361, 1391(e), and the Declaratory Judgment Act, 28 U.S.C. § 2201, to compel the MRC to comply with the transparency obligations under FACA and remedy its non-compliance.

11.     This case arises out of information obtained in discovery in the consolidated case, *State of Mississippi v. United States*, 19-231 L (Fed. Cl.), a Fifth Amendment "takings" claim, which seeks Government compensation to plaintiffs for Government-induced increased flooding on plaintiffs' properties along the Lower Mississippi River.  Plaintiffs in that consolidated case sought discovery of MRC documents or audiotapes discussing the flooding issues.  Plaintiffs in that case became aware that the MRC was holding closed non-public meetings, and, contrary to statutory and regulatory requirements, was neither providing the public notice of such meetings, nor public notice of the closure of such meetings, nor keeping required records of what occurred at the closed meetings (such as a transcript or recording or other meeting minutes). In short, the MRC was violating the Sunshine Act and/or FACA, which requires that the MRC provide notice of and public access to *all* of its meetings, or a good reason why it is not doing so.  Plaintiffs here seek that relief be provided under the Sunshine Act and/or FACA so that the MRC is no longer permitted to conduct business and make decisions in secret, behind closed doors, with no records maintained, on issues that are of vital concern to the Plaintiffs in this case.

## II.    JURISDICTION, VENUE AND TIMELINESS

12.    The district court has jurisdiction over this suit, as it seeks "to enforce the requirements of subsections (b) through (f) [of the Sunshine Act] by declaratory judgment, injunctive relief, [and] other relief as may be appropriate."  5 U.S.C. § 552b(h)(1).  It also has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1361 (mandamus action "to compel an officer of the United States to perform its duty").

13.    This case is timely, as the MRC has never provided notice of the non-public meetings that are the subject of this Amended Complaint. 5 U.S.C. § 552b(h)(1).  Though Plaintiffs would ordinarily be required, by statute, to bring a Sunshine Act claim within 60 days of a meeting as to which notice has been provided, that clock does not run and cannot run to require the bringing of Sunshine Act claims to meetings as to which Plaintiffs have never been provided notice.  And, in any event, an MRC meeting occurred in August 2024.

14.    Plaintiffs have standing because they have a legal right to the open meeting and related requirements required by the Sunshine Act, FACA, and the MRC's implementing regulations.  As the MRC for years has not provided the requisite notices of and access to its meetings, Plaintiffs have suffered precisely the type of harm that Congress sought to prevent by the Sunshine Act and FACA.

15.    Venue is proper in this District (the Southern District of Mississippi) since the MRC's headquarters is located in Vicksburg, Mississippi, 5 U.S.C. § 552b(h)(1), and because a substantial part of the acts and omissions giving rise to this action took place in this District.

### III.    PARTIES

#### A.    Plaintiffs.

##### 1.    Emmerich Newspapers, Inc.

16.    Plaintiff Emmerich Newspapers, Inc. ("Emmerich Newspapers") is a Mississippi corporation with its principal place of business at 246 Briarwood Drive, Suite 101, Jackson, Mississippi. Emmerich Newspapers is a print and digital media company that produces, through its subsidiaries, original news content. The Emmerich family is a local journalism dynasty that started in 1923, when John Oliver Emmerich, Sr. bought a weekly newspaper in McComb, Mississippi. The Emmerich name became synonymous with the news in Mississippi. The most prestigious journalism award in the state is the John Oliver Emmerich Award for Editorial Excellence. In 1990, John Emmerich, Sr.'s grandson, Wyatt Emmerich, took over the family business. Today, Emmerich Newspapers publishes two daily and 23 weekly newspapers operating in 18 Mississippi markets, two markets in Louisiana, and one market in Arkansas. Emmerich Newspapers also publishes 22 news websites.  The actions of the MRC in discussing options for managing, making decisions regarding managing, and carrying out the management of the Mississippi River is information that is vital to the readership of the Emmerich Newspapers. Emmerich Newspapers also have operations and buildings in Mississippi that are affected by flooding of the Mississippi River, and the decisions made by the MRC regarding managing and carrying out the management of the Mississippi River.

17.    Emmerich Newspapers is a parent and holding company which owns 100% of the stock in 22 subsidiary companies, including:

> a.    J.O. Emmerich & Associates, Inc., which is a Mississippi corporation with its principal office address at 112 Oliver Emmerich Dr., McComb, MS 39649 that publishes the five-day-a-week *Enterprise-Journal* in print in McComb and the digital edition at www.enterprise-journal.com;

b.   Delta-Democrat Publishing, Inc., which is a Mississippi corporation with its principal office address at 988 N. Broadway, Greenville, MS 38701 that publishes the twice-weekly *Delta Democrat Times* in Greenville and the digital edition at www.ddtonline.com;

c.   Commonwealth Publishing, Inc., which is a Mississippi corporation with its principal office address at 329 Highway 82 West, Greenwood, MS 38930 that publishes the five-day-a-week *Greenwood Commonwealth* and the digital edition at www.gwcommonwealth.com;

d.   Delta Press Publishing, Inc., which is a Mississippi corporation with its principal office address at 123 Second Street, Clarksdale, MS 38614 that publishes the weekly *Clarksdale Press Register Commonwealth* and the digital edition at www.pressregister.com;

e.   Newton County Appeal, Inc., which is a Mississippi corporation with its principal office address at 105 Main Street, Union, MS 39365 that publishes the weekly *Newton County Appeal* and the digital edition at www.newtoncountyappeal.com;

f.   Marion Publishing, Inc., which is a Mississippi corporation with its principal office address at 318 Second Street, Columbia, MS 39429 that publishes the twice-weekly *Columbian-Progress* and the digital edition at www.columbianprogress.com;

g.   Yazoo Newspaper, Inc., which is a Mississippi corporation with its principal office address at 1035 Grand Avenue, Yazoo City, MS 39194 that publishes the weekly *Yazoo Herald* and the digital edition at www.yazooherald.net;

h.   Sunland Publishing, Inc. which is a Mississippi corporation with its principal office address at 246 Briarwood Drive, Suite 101, Jackson, MS 39206 that publishes the weekly *Northside Sun* and the digital edition at www.northsidesun.com;

i.   Simpson Publishing, Inc., which is a Mississippi corporation with its principal office address at 206 N. Main Street, Magee, MS 39111 that publishes the weekly *Magee Courier* and the weekly *Simpson County News* in Jackson, both published online at www.simpsoncounty.ms;

j.   Montgomery Publishing, Inc., which is a Mississippi corporation with its principal office address at 321 Summit Street, Winona, MS 38967 that

publishes the weekly *Winona Times* and the weekly *Carrollton Conservative*, both published online at www.winonatimes.com;

k.  Franklinton Publishing, Inc., which is a Louisiana corporation with its principal office address at 41738 Highway 10, Franklinton, LA 70438 that publishes the weekly *Franklinton Era-Leader* in Franklinton, Louisiana, published online at www.era-leader.com;

l.  Charleston Publishing, Inc., which is a Mississippi corporation with its principal office address at 149 South Square, Charleston, MS 39206 that publishes the weekly *Charleston Sun-Sentinel*, published online at www.tallahatchienews.ms;

m.  Clarion Publishing, Inc., which is an Arkansas corporation with its principal office address at 322 South Court Street, Dumas, AR 71639 that publishes the weekly *Dumas Clarion* in Dumas, Arkansas, published online at www.dumasclarion.com;

n.  Scott County Publishing, Inc., which is a Mississippi corporation with its principal office address at 311 Smith Avenue, Forest, MS 39074 that publishes the weekly *Scott County Times*, published online at www.sctonline.net;

o.  Clarke Publishing, Inc., which is a Mississippi corporation with its principal office address at 101 Main Street, Quitman, MS 39355 that publishes the weekly *Clarke County Tribune*, published online at www.clarkecountytrib.com;

p.  Hattiesburg Publishing, Inc., which is a Mississippi corporation with its principal office address at 525 N. Main Street, Hattiesburg, MS 39401 that publishes the weekly *Pine Belt News*, published online at www.hubcityspokes.com;

q.  Tallulah Publishing, Inc., which is a Louisiana corporation with its principal office address at 300 S. Chestnut Street, Tallulah, LA 71282 that publishes the weekly *Madison Journal* in Tallulah, Louisiana, published online at www.madisonjournal.com;

r.  Louisville Publishing, Inc., which is a Mississippi corporation with its principal office address at 233 North Court, Louisville, MS 39339 that publishes the weekly *Winston County Journal*, the weekly *Webster Progress- Times* and the weekly *Choctaw Plain Dealer*, all published online at www.redhillsmsnews.com;

s.  Kosciusko Star-Herald, Inc., which is a Mississippi corporation with its principal office address at 207 N. Madison Street, Kosciusko, MS 39090 that publishes the weekly *Kosciusko Star-Herald*, published online at www.starherald.net;

t.     Enterprise-Tocsin, Inc., which is a Mississippi corporation with its principal office address at 114 Main Street, Indianola, MS 38751 that publishes the weekly *Enterprise-Tocsin* in Indianola, published online at www.enterprise-tocsin.com;

u.     Grenada Star, Inc., which is a Mississippi corporation with its principal office address at 355 W. Monroe Street, Grenada, MS 38901 that publishes the weekly *Grenada Star*, published online at www.grenadastar.com; and

v.     Tate Record, Inc., which is a Mississippi corporation with its principal office address at 219 East Main Street, Senatobia, MS 38668 that publishes the weekly *Tate Record* in Senatobia, published online at www.taterecord.com.

18.     Emmerich Newspapers produces more original news content than any organization in Mississippi. Open meetings and governmental transparency are fundamental to Emmerich Newspapers' business.

19.     The flooding of southwest Mississippi is a significant statewide story. For example, the flooding of the Mississippi River impacts lease revenues from State-owned properties which help fund the state public schools. This affects the entire State.

20.     Emmerich Newspapers has operations and buildings that are affected by flood damage and higher insurance premiums to protect against floods.

21.     The State of Mississippi has its entire western border defined by the Mississippi River. Information regarding the Mississippi River is critical news for Emmerich Newspapers' print and online readers. The withholding of such critical news by secret meetings and confidential documents fundamentally undermines the Emmerich Newspapers' ability to serve their customers and fulfill their role as a news organization.

22.     Emmerich Newspapers is not a plaintiff in the consolidated *Mississippi v. United States* takings case.

### 2.     Howard Jones.

23.     Plaintiff Howard Jones ("Plaintiff Jones"), whose home is located at 15 Bluff Hills

Place, Natchez, MS, is the principal owner of J.M. Jones Lumber Co., Inc., which owns approximately 89 acres near River Mile 362 in Adams County, Mississippi, and 190 acres near River Mile 315 in Wilkinson County.  Plaintiff Jones, through J.M. Jones Lumber Co., has used this property as a sawmill and timber business.  In addition, Plaintiff Jones, through his business, is impacted by flooding on the Mississippi batture, to the extent that flooding destroys or damages timber or impacts his ability to harvest timber.  Mr. Jones is not a plaintiff in the consolidated *Mississippi v. United States* takings case, though his company, J.M. Jones Lumber Co., is a plaintiff in that case.

### B.  Defendant: The Mississippi River Commission

24.    The Mississippi River Commission Act established the MRC in 1879. *See* June 28, 1879, c. 43, § 1, 21 Stat. 37. It consists of seven members: three Generals from the United States Army Corps of Engineers, an Admiral from the National Oceanic and Atmospheric Administration, and three civilians appointed by the U.S. President.  The Commanding General of the Mississippi Valley Division of the United States Corps of Engineers is the President of the MRC.

25.    Congress has assigned the MRC numerous duties, responsibilities, as well as the power to exercise discretion (including requesting resources as needed) in connection with the exercise of its duties, in connection with managing the Mississippi River and prosecuting the Mississippi River & Tributaries Project.  These duties are set forth over numerous statutes

26.    The Flood Control Act of 1928 provided, at Section 8:

The project herein authorized [the Mississippi River and Tributaries Project] shall be prosecuted by the Mississippi River Commission under the direction of the Secretary of War and supervision of the Chief of Engineers and subject to the provisions of this Act.  It shall perform such functions and through such agencies as they shall designate after consultation and discussion with the president of the commission.…The commission shall make inspection trips of such frequency and

duration as will enable it to acquire first-hand information as to conditions and problems germane to the matter of flood control within the area of its jurisdiction; and on such trips of inspection ample opportunity for hearings and suggestions shall be afforded persons affected by or interested in such problems.

27.    Title 33, U.S.C. § 647, "Mississippi River survey," provides, in full:

**Detail of assistants; vessels; instruments** - It shall be the duty of the Mississippi River Commission *[1]* to direct and complete such surveys of the Mississippi River, between the Head of the Passes near its mouth to its headwaters as may have been in progress June 28, 1879, and *[2]* to make such additional surveys, examinations, and investigations, topographical, hydrographical, and hydrometrical, of said river and its tributaries, as may be deemed necessary by said commission to carry out the objects of sections 641 to 644, 646, and 647 of this title. And to enable said commission to complete such surveys, examinations, and investigations, the Secretary of the Army shall, *[3]* when requested by said commission, detail from the Engineer Corps of the Army such officers and men as may be necessary, and shall place in the charge and for the use of said commission such vessel or vessels and such machinery and instruments as may be under his control and may be deemed necessary. And the Secretary of Commerce shall, *[4]* when requested by said commission in like manner detail from the National Ocean Survey such officers and men as may be necessary, and shall place in the charge and for the use of said commission such vessel or vessels and such machinery and instruments as may be under his control and may be deemed necessary. *[5]* And the said commission may, with the approval of the Secretary of the Army, employ such additional force and assistants, and provide, by purchase or otherwise, such vessels or boats and such instruments and means as may be deemed necessary.

**Plans; report** - It shall be the duty of said commission *[6]* to take into consideration and mature such plan or plans and estimates as will correct, permanently locate, and deepen the channel and protect the banks of the Mississippi River; improve and give safety and ease to the navigation thereof; prevent destructive floods; promote and facilitate commerce, trade, and the postal service; and when so prepared and matured, *[7]* to submit to the Secretary of the Army a full and detailed report of their proceedings and actions, and of such plans, with estimates of the cost thereof, for the purposes aforesaid, to be by him transmitted to Congress: Provided, That the commission *[8]* shall report in full upon the practicability, feasibility, and probable cost of the various plans known as the jetty system, the levee system, and the outlet system, as well as upon such others as they deem necessary.

**Plans for immediate works** - The said commission *[9]* may, prior to the completion of all the surveys and examinations contemplated by sections 641 to 644, 646, and 647 of this title, prepare and submit to the Secretary of the Army, plans, specifications, and estimates of costs for such immediate works as, in the judgment of said commission, may constitute a part of the general system of works herein contemplated, to be by him transmitted to Congress.

(bracketed numbers added).

28.    Other statutes reference the role of the MRC in formulating the flood control plans for the Mississippi River (and its tributaries and distributaries).  Subsequent to its establishment in 1879, the jurisdiction of the MRC was extended at various times.  Title 33 U.S.C. § 648 ("Arkansas River; levee and bank protection'") provides that in connection with the expansion of MRC jurisdiction to a portion of the Arkansas River, funds appropriated by Congress for improving the Mississippi River "may be expended within the limits of said extended jurisdiction under the direction of the Secretary of the Army, *in accordance with the plans, specifications, and recommendations of the Mississippi River Commission*, as approved by the Chief of Engineers[.]" (emphasis supplied).  Similar language was used when Congress extended the jurisdiction of the MRC to Rock Island Illinois.  33 U.S.C. § 650 ("Mississippi River below Rock Island; levee and bank protection").  *See also* 33 U.S.C. § 702 – Mississippi River ("For controlling the floods of the Mississippi River and continuing its improvement from the Head of the Passes to the Mouth of the Ohio River the Secretary of the Army is empowered, authorized, and directed to carry on … *the plans of the Mississippi River Commission*"); 33 U.S.C. § 702a (adopting the flood control plans "*recommended by the Mississippi River Commission* in its special report dated November 28, 1927"); 33 U.S.C. § 702j (sending MRC's conclusions and recommendations to Congress); 33 U.S.C. § 702a-12 (referencing engineering plans in reports of the Mississippi River Commission).

29.    The role of the MRC in managing the Mississippi River and addressing the numerous conflicting priorities and interests in doing so is set forth in its 253-page book "Upon Their Shoulders – A history of the Mississippi River Commission from its inception though the advent of the modern Mississippi River and Tributaries Project."  The book was written by a Corps historian and published by the MRC. This book is accessible at the following website:

https://usace.contentdm.oclc.org/digital/api/collection/p16021coll4/id/154/page/0/inline/p16021c oll4_154_0 (last accessed December 30, 2024).

## IV.    MEETINGS OF THE MISSISSIPPI RIVER COMMISSION – THE HIGH WATER AND LOW WATER INSPECTION TRIPS.

### A.    Public Meetings.

30.    Twice a year, the MRC conducts what it describes as "Inspection Trips" along the Mississippi River: a "High Water Inspection Trip" (typically in April), and a "Low Water Inspection Trip" (typically in August).  MRC Members, along with pertinent Corps personnel, travel the Mississippi River aboard the "MV [motor vessel] Mississippi."  The MV Mississippi makes stops at various locations associated with the Corps of Engineers Districts in the Mississippi River (*e.g.*, the St. Louis District, the Memphis District, the Vicksburg District, and the New Orleans District).

31.    The MRC holds public meetings at various stops.  At these meetings, the public can board the MV Mississippi and make statements presenting their issues or concerns related to the Mississippi River. For example, a property owner could report riverbank erosion, or raise concerns about increased flooding, regulatory permitting issues, or the impacts of a Corps' project.  These public presentations are brief, and, in general, are not supposed to be longer than 5 minutes.

32.    Plaintiff Howard Jones's father, H. Lee Jones, addressed the MRC at its Low Water Inspection Trip in Natchez in August 2016, at which time he raised concerns about the MRC's management of the Mississippi River and its flooding impact on the hardwood forests.  He explained to the MRC: "The forest[s] in the batture [have] diminished in every way: regeneration of trees, wildlife habitat just to get started. In the sixties we'd harvest a mature tree and come back in five years observing six to eight seedlings and sprouts would have taken its place.  Now due to the River stages lingering for so long over forty feet on the Natchez gage during seed

13

germination time we have virtually no regeneration occurring.   Wildlife browse is greatly diminished."

33.    Plaintiff Howard Jones addressed the MRC at its High-Water Inspection Trip in Greenville, Mississippi, in April 2018, where he stated, in part: "I have worked in the batture my entire career.   Our company manages about 150,000 acres up and down the Mississippi River.   I have seen first-hand the devastating effects of the increased flooding over the past ten years.   Trees are degrading and dying.   The huge deposits of sand and silt are rendering the soil sterile.   Very little or no regeneration is occurring.   These floods are destroying an ecosystem that sustains some of the most fertile timberland and abundant wildlife in our country.   This is not up for debate."

34.    At the public meetings, the Commanding General of the Mississippi Valley Division (MVD) and the senior officer of the particular District within the MVD, typically a Colonel, will also make general statements to the public in attendance about various issues that impact the Mississippi River and the District.

35.    The MRC has acknowledged that it is subject to the Sunshine Act.   It publishes notices in the Federal Register under the caption "Sunshine Act Meetings; Mississippi River Commission" advising of public meetings that are part of the Inspection Trips.   The following is an example of such a notice:

**DEPARTMENT OF DEFENSE**

**Department of the Army, Corps of Engineers**

**Sunshine Act Meetings**

**AGENCY HOLDING THE MEETINGS:**
Mississippi River Commission

**TIME AND DATE:** 9:00 a.m., August 19, 2024.

**PLACE:** On board MISSISSIPPI V at City Front, Cape Girardeau, Missouri.

**STATUS:** Open to the public.

**MATTERS TO BE CONSIDERED:** (1) Summary report by President of the Commission on national and regional issues affecting the U.S. Army Corps of Engineers and Commission programs and projects on the Mississippi River and its tributaries; (2) District Commander's overview of current project issues within the Memphis District; and (3) Presentations by local organizations and members of the public giving views or comments on any issue affecting the programs or projects of the Commission and the Corps of Engineers.

**TIME AND DATE:** 9:00 a.m., August 20, 2024.

**PLACE:** On board MISSISSIPPI V at Mud Island Park, Memphis, Tennessee.

**STATUS:** Open to the public.

**MATTERS TO BE CONSIDERED:** (1) Summary report by President of the Commission on national and regional issues affecting the U.S. Army Corps of Engineers and Commission programs and projects on the Mississippi River and its tributaries; (2) District Commander's overview of current project issues within the Memphis

District; and (3) Presentations by local organizations and members of the public giving views or comments on any issue affecting the programs or projects of the Commission and the Corps of Engineers.

**TIME AND DATE:** 9:00 a.m., August 21, 2024.

**PLACE:** On board MISSISSIPPI V at Boat Landing below bridge, Lake Village, Arkansas.

**STATUS:** Open to the public.

**MATTERS TO BE CONSIDERED:** (1) Summary report by President of the Commission on national and regional issues affecting the U.S. Army Corps of Engineers and Commission programs and projects on the Mississippi River and its tributaries; (2) District Commander's overview of current project issues within the Vicksburg District; and (3) Presentations by local organizations and members of the public giving views or comments on any issue affecting the programs or projects of the Commission and the Corps of Engineers.

**TIME AND DATE:** 9:00 a.m., August 23, 2024.

**PLACE:** On board MISSISSIPPI V at Garber Brothers Marine Dock, Berwick, Louisiana.

**STATUS:** Open to the public.

**MATTERS TO BE CONSIDERED:** (1) Summary report by President of the Commission on national and regional issues affecting the U.S. Army Corps of Engineers and Commission programs and projects on the Mississippi River and its tributaries; (2) District Commander's overview of current project issues within the New Orleans District; and (3) Presentations by local organizations and members of the public giving views or comments on any issue affecting the programs or projects of the Commission and the Corps of Engineers.

**CONTACT PERSON FOR MORE INFORMATION:**
Mr. Charles A. Camillo, telephone 601–634–7023.

**Charles A. Camillo,**
*Executive Director, Mississippi River Commission.*
[FR Doc. 2024–17417 Filed 8–2–24; 11:15 am]
**BILLING CODE 3720–58–P**

36.    The MRC also posts notice of the public meetings on its website. The following is a screenshot of https://www.mvd.usace.army.mil/About/Mississippi-River-Commission-MRC/Public-Meeting-Schedule/, which shows a typical notice:



37.    For some period of time, at least since 2016, the MRC has recorded the public meetings, maintained audiotapes of these meetings, and prepared transcripts.

38.    These public MRC meetings provide the Commission with anecdotal (albeit somewhat random) information about a variety of public perceptions or complaints from scattered property owners with varied interests. The formal published notice(s) of the public meetings do

not identify topics or issues that may be of special concern to the public.  The notices as to the topics of these "public hearings" have not changed in substance since at least 2010.

39.    One of the primary purposes of the public meetings is to generate positive press attention for the MRC and the Corps.  Most of the 2016 "Standard Operating Procedures (SOP) Guide for Preparing Mississippi River Commission Inspection Trips" ("the SOP") consists of detailed instructions to the various District Public Affairs Officers as to how to use the Inspection Trip to generate favorable publicity for the Corps and MRC. The SOP provides sample press releases and other messaging points to be distributed, details as to how the press should be invited and the conditions of press availability for the Commanding General, sample media invitations, forms to identify the media that have been invited, including information as to who will definitely attend, and the particular issues of interest.  The SOP provides that after an Inspection Trip, "each district [Public Affairs Officer] will provide [to MVD's Public Affairs office]:  … [a] list of all media reports generated from the MRC public hearing … to include whether the reports were positive or negative" and "[a]n analysis of whether or not the key strategic messages were captured by the media."  Appendix F titled "MRC President and Members' Expectations," includes:

1.    Local coverage in print.

2.    Local coverage on TV/radio.

3.    …

4.    Make the most of your media relationship (local, regional, national). Invite them to everything. … Show them how special they are by sending the media kits in advance.

5.    Take advantage of your local key audiences: schools and youth programs; business, civic, church, and social groups; community leaders, special interest groups, etc.  **KEY EMPHASIS:  engage local public/private schools to have the kids (1-12 grades) through the MV MISSISSIPPI anytime while docked – include during the public meetings**. [bold in original]

6.    While your portion of the trip is still underway or just concluding, send an email to your PAO community in MVD [the Mississippi Valley Division] touting your successes, what worked, what didn't.

40.    This Amended Complaint does not take issue with the MRC's compliance with the Sunshine Act as it relates to providing public notice of and public access to the above-described "public meetings" that occur on the MRC Inspection Trips. Rather, the above discussion demonstrates: 1) the MRC's recognition that the Sunshine Act applies to the conduct of MRC, 2) the MRC's recognition that scheduled meetings where the MRC assembles for the purposes of receiving information on issues affecting the MRC's responsibilities are "meetings" to which the Sunshine Act pertains, and 3) the limited nature of the information provided to the press.

**B.    Non-Public Meetings on the Inspection Trips and Elsewhere.**

41.    While the MRC uses the public forums on the Inspection Trips to hear from property owners and generate good public relations with the community, virtually no substantive work of the MRC is conducted in these public meetings.

42.    As reflected in the notices, the public meetings take up about four mornings of what is typically a six-day Inspection Trip.  The rest of the time on these Inspection Trips is filled with non-public and secret meetings where the MRC considers issues of concern.  It is in these non-public, secret meetings that the real work of the MRC is conducted, without notice to the public or press and behind closed doors, in violation of the strictures of the Sunshine Act, FACA, and the MRC's implementing regulations.

43.    Examples of the meetings as to which no public notice or public access has been provided are set forth in the following paragraphs.

**1.    Briefings by the District Commanders (the "Detailed District Engineer Briefs").**

44.    During the Inspection Trips, the MRC receives non-public detailed briefings from

the U.S. Army Colonels in charge of the various Districts (sometimes called the District Engineer or "DE" Briefing).

45.    These DE Briefings are subject to extensive internal District review prior to their presentation to the MRC.  For example, in the spring Inspection Trip of April 2018, Colonel Michael Clancy, Commander of the New Orleans District, presented to the MRC a 40-page PowerPoint slide show, replete with "bullets" associated with the various projects and issues in that District.

46.    In a deposition in the *Mississippi v. United States* case, a senior-level civilian in the Corps' New Orleans District explained the difference between the "public brief" (the public meetings where the District Commander presented an "overview" to the public) and the "detailed brief" (the referenced slideshows) presented by the District Commander to the MRC.  The deponent was also examined as to whether there was a record or recording of the "detailed brief" from the District Colonel to the MRC:

> **Q.· · · ·Okay.· But as a general matter, the slideshows**
> **17· ·that we've seen -- or the slideshows that are prepared**
> **18· ·for every trip, are they presented to the MRC alone?**
> **19· ·Or are these slideshows which were presented to the MRC**
> **20· ·and the public at large?**
> 21· ·A.· · · ·The detailed briefs would typically be between
> 22· ·the District and the MRC.
> **23· ·Q.· · · ·Okay.**
> 24· ·A.· · · ·And the public brief would usually be a little
> 25· ·general -- more general and higher level.
> **·1· ·Q.· · · ·So when you talk about the "detailed brief,"**
> **·2· ·you're talking about the slideshows that we've seen**
> **·3· ·pretty -- that we've seen so far today; correct?**
> ·4· ·A.· · · ·What I'm saying is that level of detail -- not
> ·5· ·specific to Old River or any particular topic, but that
> ·6· ·level of detail, at least from my experience in the
> ·7· ·New Orleans District, that is typically what is
> ·8· ·presented between the District Commander and the MRC.
> **·9· ·Q.· · · ·Okay.· And --**

10· ·A.· · · ·And not necessarily at the public meeting.

**11· ·Q.· · · ·Okay.· And who -- who is present for those**

**12· ·presentations?**

13· ·A.· · · ·So, again, I'm not speaking specific to any

14· ·particular presentation.· But typically it would be

15· ·your Mississippi River Commission members, it would be

16· ·the Commander of that District.· You would have the

17· ·senior executive service personnel from MVD [the Mississippi Valley
·  ·  ·  ·  ·Division of the Corps].· The DPM [Deputy Program Manager]

18· ·from a particular District.

19· · · · · · · · And then if any particular subject matter

20· ·expert was needed, it would not be uncommon to have

21· ·some of the subject matter experts in the meeting.

**22· ·Q.· · · ·Would -- would persons or persons -- personnel**

**23· ·who are not associated with the MRC or the Corps of**

**24· ·Engineers be present at those meetings?**

25· ·A.· · · ·From my experience, serving in this role as

·1· ·the New Orleans District, that would not be typical.

·2· ·I'm not saying it would not possibly occur, but that

·3· ·would typically not be the case.· ***It's typically a***

***·4· ·closed meeting***.

**·5· ·Q.· · · ·And, I mean, did you ever attend any of these**

**·6· ·meetings that were held, you know, by the Vicksburg**

**·7· ·District or by the Memphis District?**

·8· ·A.· · · ·No.

**·9· ·*Q.· · · ·And who, if anyone, takes notes or records***

***10· ·these meetings?***

***11· ·A.· · · ·I assume you're referring to the DE briefs to***

***12· ·the Mississippi River Commission --***

***13· ·Q.· · · ·Yes.***

***14· ·A.· · · ·-- that would take notes?***

***15· ·Q.· · · ·Yeah.***

***16· ·A.· · · ·I'm assuming everyone in the room is taking***

***17· ·their own notes.· I have not ever been provided a***

***18· ·recording of notes from those DE briefs.· I'm not aware***

***19· ·that the notes -- meetings are being recorded.***

***20· ·Q.· · · ·Is there a stenographer that you recall being***

***21· ·present at those detailed briefs?***

***22· ·A.· · · ·Not -- not at the briefs between the DE and***

***23· ·the MRC Commissioners, no.***

(Underlined emphasis added.)

47.    Unlike the public meetings as to which notice and access is provided and a record made, the MRC does not provide notice to the public or press or access to these "detailed briefs;" the public is not permitted to attend these and no stenographic record or audio recording of these detailed briefs exist. These District Commander's "detailed briefs" are conducted in secret.

### 2.    Technical and Policy Presentations and Related Presentations by Corps of Engineers Personnel.

48.    The MRC also receives technical and policy presentations (and similar presentations) from Corps of Engineers staff on a variety of issues of importance to the MRC.  For example, the High-Water Inspection Trip schedule for 2017 (one of the few schedules in the Plaintiffs' possession) discloses numerous presentations, including updates from various components of the Corps of Engineers as well as a presentation described as "ORC 70/30 Split Briefing."

49.    A Corps scientist was asked at a deposition about technical presentations he made to the MRC.  He explained that these were closed meetings of which there was no record.

> ·  Q.·  ·**Okay.·  Other than the time you previously**
> 16·  **testified about where you made a presentation about the**
> 17·  **backwater floodway paper, have you made any**
> 18·  **presentations or other presentations to the MRC?**
> 19·  ·  ·  A.·  ·A couple of different times.
> 20·  ·  ·  **Q.·  ·What other -- what other presentations have you**
> 21·  **made to the MRC?**
> 22·  ·  ·  A.·  ·One of them had to do with irrigation projects
> 23·  in Arkansas.·  Another one was talking about the
> 24·  hydrologic analysis for that flowline study that you
> 25·  referred to, having an update.·  And those are the only
> ·1·  ones I recall.
> ·2·  ·  ·  Q.·  ·**Okay.·  And can you give me a flavor of what**
> ·3·  **happens at these MRC presentations?·  In other words,**
> ·4·  **just give me the setting.·  Are the commissioners all,**
> ·5·  **you know, behind some sort of set of tables, and is**
> ·6·  **there like a -- is there like a conference room or a**
> ·7·  **hall where somebody is up front?·  Just what is -- what**

·8· **goes on there, and what does it look like?**
·9· · · A.· ·Well, sometimes it's in a conference room, and
10· the MRC typically is seated behind tables with their
11· notes and their copies of the slides for their
12· reference.· But sometimes it's also on the Motor Vessel
13· Mississippi that you use for their high water and low
14· water inspection trip.
15· · · **Q.· ·Okay.· And is there somebody taking notes or**
16· **minutes of the -- of the presentations, to the best of**
17· **your recollection?**
18· · · A.· ·I'm not aware of a designated note taker, but
19· there could be.
20· · · **Q.· ·Well, is Mr.-- was [the Executive Secretary of the MRC] present**
· · · · **or has he**
21· **been typically present at the meetings that you have**
22· **attended?**
23· · · A.· ·Since he is in his current role, yes, but some
24· of the meetings that I was involved in were prior to
25· him, and it was his counterpart.
·1· · · **Q.· ·Okay.· And does [he] take notes?**
·2· · · A.· ·Generally all the commissioners and [he]
·3· will take notes.
·4· · · **Q.· ·Is that something you have observed and you can**
·5· **recall specifically?**
·6· · · A.· ·I can recall them taking notes, but I would not
·7· know what they were making notes of.
·8· · · **Q.· ·Of course.**
·9· · · A.· ·I've never seen their notes.
10· · · ***Q.· ·Of course.· Are those meetings recorded or***
11· ***videotaped, to your knowledge?***
12· · · ***A.· ·Not to my knowledge.***
13· · · ***Q.· ·Do you know if the public is permitted to***
14· ***attend those meetings?***
15· · · ***A.· ·The meetings I'm talking about where we're***
16· ***presenting technical information, typically not.***

(Underlined emphasis added.)

50.· · The MRC does not provide public notice of the existence of or the topics to be

addressed in the technical or policy briefings on the Inspection Trips, the public is excluded from

them, and no stenographic record or audio recording of these presentations exists.

### 3. Other Meetings and Discussions During MRC Inspection Trips.

51. Similarly, there is no public notice when the MRC discusses the information or issues presented by the District Engineer, from Corps experts, or other sources not identified above at the numerous non-public meetings. However, the (non-public) agendas for inspection trips occasionally identify particular topics. For example, the agenda for the 2017 High Water Inspection Trip includes the following items:

- April 3, 2017 – "MRC Flowline Discussion (Members Only);"

- April 5, 2017 – "MRC Meetings/Flowline Discussion (MRC Only);"

- April 6, 2017 – "Roundtable discussion" (no topic provided).

The public was given no notice of these discussions or opportunity to observe them.

52. Similarly, the agenda for the 2017 Low Water Inspection Trip includes the following items:

- August 14, 2017 – "Panel Discussion onboard MV MS" at 10:30 a.m., with no topic specified;

- August 16, 2017 – "Panel Discussions – 2 hours" at 1:30 p.m., with no topic identified; and

- August 17, 2017 – "Panel Discussion," from 2:00 to 4:00 p.m., again with no topic listed.

The public was given no notice of these discussions nor an opportunity to observe them.

### 4. The "Winter Meetings" and Other Non-Public Meetings of the MRC.

53. In addition to the Inspection Trips, the MRC convenes for meetings at other times of the year. The MRC conducts what it refers to as its "winter meeting" at MRC Headquarters in Vicksburg, Mississippi. Topics at the winter meetings generally include project-oriented meetings to prepare for the inspection trips or for congressional visits. At the winter meetings, as with the inspection trips, the MRC receives informational briefings from Corps staff on issues of

importance associated with the MRC's management of the Mississippi River.

54.    The MRC does not provide notice of the existence of the winter meeting (or other meetings) or the topics to be addressed in those meetings.

55.    Since there is no public notice of *any* presentations, discussions, or other business, it is not known how or when the MRC "formally" discusses the information obtained from the public, considers other issues raised by the Corps as to which the public has no notice, or determines any plan of action or recommendations to the Corps.  There has never been any public notice of the MRC's consideration of the issues raised by Mr. Jones or his father, or of other citizens who have raised similar issues.  Mr. Jones has been unable to ascertain whether concerns that he and his father have raised about increased batture flooding have been considered by the MRC.  Mr. Jones has not been provided notice of or permission to attend any additional meeting where the issues he raised have been considered, other than that meeting where he made his presentation.

## V.    PRE-2011 MEETING NOTICES.

56.    The MRC has previously recognized the applicability of the Sunshine Act to meetings at which the MRC received information and considered issues under its jurisdiction. From 1977 to 2010, the MRC provided public notice of meetings with identified subject matter, including non-Inspection Trip meetings.  These meetings included presentations or consideration of particular issues.  Each of the public notices was captioned "Sunshine Act Meeting."  Each of the public notices described the meeting as follows: "Status: Open to the public for observation, but not for participation."  Some these notices, identifying "Matters to be Considered," included:

   a.    **October 14, 2010.**  "Matters To Be Considered: The Commission will consider the Louisiana Coastal Area, Louisiana, Ecosystem Restoration, Six Projects Authorized by Section 7006(e)(3) of Water Resources Development Act of 2007." 75 Fed. Reg. 63205-01, 2010 WL 3998855 (Fed. Reg.).

b.      **November 15, 2004.** "Matters To Be Considered: The Commission will consider the Louisiana Coastal Area Ecosystem Restoration Study, Final Report and Environmental Impact Statement." 69 Fed. Reg. 65656-01, 2204 WL 2577358 (Fed. Reg.).

c.      **October 29, 2004.** "MATTERS TO BE CONSIDERED: The Commission will consider the Upper Mississippi River-Illinois Waterway System Navigation Feasibility Study, Final Integrated Feasibility Report, and Programmatic Environmental Impact Statement." 69 Fed. Reg. 62917-01, 2004 WL 2398992 (Fed. Reg.).

d.      **November 3, 2000.** "MATTER TO BE CONSIDERED: The Commission will consider the Wolf River, Memphis, Tennessee, Final Feasibility Report and Final Environmental Impact Statement." 65 Fed. Reg. 66264-01, 2000 WL 1643448 (Fed. Reg.).

e.      **May 28, 1992.** "MATTERS TO BE CONSIDERED: The Commission will consider the St. Francis River Basin Below Wappapelo Lake, Missouri and Arkansas—Whiteman's Creek, Arkansas, Final Feasibility Report." 57 Fed. Reg. 22528-02, 1992 WL 111791 (Fed. Reg.).

57.    The "Sunshine Act Meeting" notice for the MRC for a **1977 meeting** that was "open to the public for observation but not for participation" set forth an agenda consisting of "reports of the Commission staff" on a variety of issues:

MISSISSIPPI RIVER COMMISSION.

TIME AND DATE: Beginning at 9 a.m., July 28, 1977, and adjourning 12 noon, July 29, 1977.

PLACE: 1400 Walnut Street, Vicksburg, Mississippi.

STATUS: Open to the public for observation but not for participation.

MATTERS TO BE CONSIDERED:

Reports of the Commission staff on:

(1) Current river conditions;
(2) Inspection of the east shoreline of the Mississippi River south of Mayfield Creek, Kentucky;
(3) Inspection of the west bank of the Mississippi River near the SEMO grain elevator in Missouri;
(4) Marking dikes in the Mississippi River;
(5) Ground cover for levees and berms;
(6) Shaping of spoil banks and drainage of borrow pits;
(7) Drop structures and weirs in streams;
(8) Upper Pointe Coupe Flood Control Project;
(9) Incorporation of the East Bank Levee below Pointe-a-la-Hache into the Mississippi River Levee system;
(10) Inspection of the riverbank near River Ridge, Louisiana, with regard to high-water mark and Corps of Engineers' jurisdiction;
(11) Mitigation report for Tensas-Cocodrie Pumping Plant in Louisiana.

CONTACT PERSON FOR MORE INFORMATION:

Mr. Rodger D. Harris, telephone 601-636-1311, extension 2705.

[S-919-77 Filed 7-5-77;9:35 am]

58.    A search of the Federal Register reveals that since 2010, the MRC has not provided notice of *any* meeting open to the public related to *any* issue associated with the management of the Mississippi River, other than the "public meetings" during Inspection Trip meetings at which citizens were permitted to make statements.  The MRC has not provided notice of any public

meeting – even meetings where the public would be permitted to observe but not participate – on such issues as the 2011 Flood, the 2016 Flood, the 2019 Flood, the multi-year "Flowline Study," the impacts of river training structures on flooding, the "OMAR [referring to the Old River, Mississippi River, Atchafalaya River, and Red River] Technical Assessment," the State of Mississippi's (and other citizens') concerns that the MR&T Project, prosecuted by the MRC, is causing increased flooding of their properties, or how and why the MRC has made decisions allocating flood risk among different properties impacted by Mississippi River flooding.

59.    In short, *nearly all* of the MRC's work, with the limited exception of the "public meetings" noticed in exceptionally general terms, has been done in secret. MRC's notices for the public meeting are notable for failing to identify any particular issues to be considered or any other actual business to be accomplished at these meetings. Because of the secrecy of the MRC's other meetings, it is not known if the MRC is making decisions based on political considerations (as the U.S. Army is exceptionally sensitive to its relations with Congress), reputational concerns of the U.S. Army Corps of Engineers and the Commanding Generals (particularly as to the disclosure of facts that would bring to public attention negative consequences of the Corps' management of the MR&T Project), discredited or faulty science or assumptions, internally-generated "science" that has been motivated to support pre-determined Corps' positions or interests and not subject to any outside scrutiny, or information communicated to or acquired by the Commissioners outside of his or her role as a Commissioner.  Even if none of these concerns influence the decision-process of the MRC, the very purpose of the Sunshine in Government Act and FACA is to provide the citizens of this country and the press the opportunity to observe MRC meetings and decision-making process so that they may ascertain the actual bases on which the MRC makes its decisions that

affect them.  As described in Senate Report 94-354 that explained the purposes of the Sunshine Act:

> Open meetings will thus help increase the public's confidence in government by permitting the public to observe firsthand the responsible way agency heads carry out their duties.

> * * *

> The public is naturally more distrustful of government conducted in secret.  This suspicion arises in large part from the fact that meetings are closed, not from any specific evidence that improper or illegal activities are taking place behind closed doors.  Regardless of what the public actually learns about the government, the fact that this bill opens meetings formerly closed should in itself remove an important source of any distrust the public may have of government.

S. Rep. No. 94-354, Government in the Sunshine Act, Report of the Committee on Government Operations, U.S. Senate, at 4-5 (1975).

60.     Plaintiffs have a clear right to know what is happening during all MRC meetings.

61.     The MRC has a clear, nondiscretionary duty to publicly notice and make its meetings open to the public, unless it determines and publicly notices that an exemption in the regulations applies.

62.     Unless the MRC meets its obligations to publicly notice and open its meetings to the public, or explain why it is not opening those meetings, Plaintiffs have no other way of obtaining information about what occurs during such meetings or even knowing that they are happening.

## VI.    CAUSES OF ACTION

### Count One
### Violation of the Sunshine Act

63.     Paragraphs 1 through 62 are incorporated by reference as if stated in full.

64.     The Sunshine Act's core command is: "Except as provided in subsection (c) [which details certain exceptions], ***every portion of every meeting of an agency shall be open to public observation***." 5 U.S.C. § 552b(c) (emphasis added). This directive is unambiguous.

65.    The Sunshine Act defines the term "agency" to mean "any agency as defined in section 552(e)[1] of this title, headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate, …."  Current 5 U.S.C. § 552(f) provides that the term "agency" "includes any executive department, military department … or other establishment in the executive branch of the Government …"  The MRC is an "executive department, military department … or establishment in the executive branch of the Government."

66.    The Sunshine Act was enacted in 1976.  The Presidential Appointment Efficiency and Streamlining Act of 2011, enacted in 2012, eliminated the requirement that Commissioners of the MRC be approved by the Senate for the position of Commissioner, but did not otherwise change the status of the MRC as an "agency" for purposes of the Sunshine Act.

67.    For purposes of the Sunshine Act, "meeting" is defined as "the deliberations of [a quorum] where such deliberations … result in the joint conduct or disposition of official agency business."  5 U.S.C. § 552b(a)(2).  The various MRC meetings discussed in this Amended Complaint are all in furtherance of the MRC's disposition of official agency business and subject to the Sunshine Act, as was long understood by the Corps prior to approximately 2010.

68.    The Sunshine Act, at 5 U.S.C. § 552b(b) requires: "Members shall not conduct or dispose of agency business other than in accordance with this section.  Except as provided in subsection (c) [5 U.S.C. § 552b(c)], every portion of every meeting shall be open to public observation.

69.    Section 552b(c) in turn sets forth a narrow set of exceptions to the public meeting requirement (such as the consideration of national security information or discussion of personnel

---

[1] 5 U.S.C. § 552(e) was redesignated 5 U.S.C. § 552(f) by Pub. L. 99-570, sec. 1802(b).

matters) under which meetings can be closed. Those exceptions are not pertinent to such presentations as the "Detailed DE Briefs," Corps staff presentations, or other discussions of issues in a meeting context.

70.    Section 552b(d) specifies precise procedures that an agency such as the MRC must follow if it seeks to close a meeting or a portion of a meeting under one of the Section 552b(c) exceptions. Those procedures require a formal vote to close the meeting, public notice of the fact of the closed meeting, records of the votes closing the meetings, maintaining stenographic records of what occurs at those closed meetings, executing certifications from legal officers as to the bases for closing meetings, and similar requirements.

71.    On January 12, 1977, the MRC proposed regulations "to implement Sections (b) through (f) of the Government in the Sunshine Act (5 U.S.C. § 552b) to provide for public observation of meetings of the Commission." 42 Fed. Reg. 13286.

72.    The regulations the MRC adopted to govern its actions that track the Sunshine Act remain part of the Code of Federal Regulations. *See* 33 C.F.R. § 209.50 – *Mississippi River Commission: Public observation of Commission Meetings*. These regulations require, among other provisions:

> a.    That at least one week before each Commission meeting the Secretary shall issue a public announcement which states the time and place of the meeting, lists the agenda items or subjects to be discussed at the meeting, states whether the meeting or portions of the meeting are to be closed or open to public observation, and states whether or not public participation in the meeting will be permitted. 33 C.F.R. § 209.50(d)(1)(i)-(iv).

> b.    That immediately following each public announcement, notice of the time, place, and subject matter of a meeting, whether a portion or portions of the meetings are open or close to public observation, shall be submitted for publication in the Federal Register. 33 C.F.R. § 209.50(d)(5).

      c.       That all Commission meetings shall be open to the public except when the Commission determines that public disclosure of information to be discussed in a portion or portions of a meeting meet specific exceptions, such as national security information, internal personnel rules, information of a personal nature, law enforcement investigatory materials, and other categories not relevant to this Amended Complaint. 33 C.F.R. § 209.50(e)(1).

      d.       That actions to close a meeting or portion of a meeting under the specific grounds provided by rule (and statute) shall be taken only when a majority of the entire membership of the Commission votes to take such action; that the votes shall be recorded, that within one of any such vote the Commission shall make available a written copy of such vote; and the Chief Legal Officer of the Commission shall public certify that in his or her opinion, the meeting may be closed to the public and state each relevant exemptive provision. 33 C.F.R. § 209.50(e)(2)-(7).

      e.       That the Secretary shall maintain in the official files complete transcripts or electronic records adequate to record fully the proceedings oof the Commission including portion or portions of meetings closed to the public. 33 C.F.R. § 209.50(f)(1).

73.    Further, the MRC's Sunshine Act regulations require that in the event the MRC determines a portion or portions of a meeting may need to be closed to the public or that information may need to be withheld from the public, the Commission shall also consider whether public interest nevertheless requires that the meeting be open or the information be released to the public. *See* 33 C.F.R. § 209.50(a)(2).

74.    Plaintiffs have attempted a diligent search but have located no records that MRC meetings, or portions of MRC meetings, have been closed pursuant to the required statutory and regulatory requirements that are designed to maximize the public scrutiny of Presidential Commissions.  MRC meetings of the sort described in this Amended Complaint were never formally "closed" since they were never noticed or "open" to begin with.

75.     The MRC has violated the Sunshine Act and the MRC's own regulations since approximately 2010 by failing to provide notice of and access to meetings at which it conducts its business of prosecuting the MR&T Project.

**Count Two**
**Violation of FACA**

76.     Paragraphs 1 through 75 are incorporated by reference as if stated in full.

77.     FACA (now codified at 5 U.S.C. § 1001 *et seq.*) defines "advisory committee" as relevant to this Amended Complaint as "a committee, board, commission, council, conference, panel, task force, or other similar group … that is established or utilized to obtain advice or recommendations for the President or one or more agencies or officers of the Federal Government and that is (i) established by statute…(ii) established or utilized by the President; or (iii) established or utilized by one or more agencies." 5 U.S.C. § 1001(2)(A)(i)-(iii).

78.     If for any reason the MRC is not considered an agency under the Sunshine Act, it is an advisory committee under FACA in that it is a commission or similar group, established by statute and is utilized to obtain advice by agencies and/or officers of the United States.  *See, e.g.*, 1879 Mississippi River Commission Act, June 28, 1879, c. 43, § 1, 21 Stat. 37 (establishing the MRC) and 33 U.S.C. §§ 647-648, 650 (MRC's advice provided to Secretary of the Army).

79.     In enacting FACA, Congress required that "Congress and the public should be kept informed with respect to the … activities … of advisory committees." 5 U.S.C. § 1002(b)(5).

80.     FACA further provides: "Each advisory committee meeting shall be open to the public," 5 U.S.C. § 1009(a)(1), and "timely notice of each meeting shall be published in the Federal Register …"   5 U.S.C. § 1009(a)(2).

81.     FACA references the Freedom of Information Act (FOIA, 5 U.S.C. § 552) as to public access to Advisory Committee records: "Subject to section 552 of this title, the records,

reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection …." 5 U.S.C. § 1009(b).

82.    FACA provides: "Detailed minutes of each meeting of each advisory committee shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee." 5 U.S.C. § 1009(c).

83.    FACA provides that advisory committees may conduct closed sessions only under the narrow and specific circumstances provided for by Section 552b(c) of the Sunshine Act, and requires similar formal procedures and record-keeping requirements as to the closure of meetings: "Paragraphs (1) [meetings open to the public] and (3) [participation and attendance of interested persons] of subsection (a) shall not apply to any portion of an advisory committee meeting for which … the head of the agency to which the advisory committee reports[] determines that such portion of the meeting may be closed to the public in accordance with section 552b(c) of this title [the Sunshine Act].  Any such determination shall be in writing and shall contain the reasons for the determination.  If such a determination is made, the advisory committee shall issue a report, at least annually, setting forth a summary of its activities and such related matters as would be informative to the public consistent with the policy of section 552(b) of this title." 5 U.S.C. § 1009(d) (bracketed notations added).

84.    The MRC has violated FACA by failing to adhere to the requirement that each meeting of the MRC be "open to the public" and that "timely notice of each meeting …be published in the Federal Register," as required by 5 U.S.C. § 1009(a)(2).

85.    The MRC has violated FACA by failing to maintain and make available for public inspection "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee" as required by 5 U.S.C. § 1009(b) and 5 U.S.C. § 552.

86.    The MRC has violated FACA by failing to keep "detailed minutes of each meeting of each advisory committee [which] shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved" as required by 5 U.S.C. § 1009(c).

87.    The MRC has violated FACA by failing to adhere to the provisions of FACA that incorporate the Sunshine Act and permit closing of MRC meetings only in the narrow situations defined by the Sunshine Act. The MRC also violates those FACA provisions that require that the determination to close a meeting be put in writing by the MRC, that the reasons be in writing, and that the agency file an annual report explaining the closings, as required by 5 U.S.C. § 1009(d)

## VII.    <u>RELIEF SOUGHT</u>

88.    WHEREFORE, Plaintiffs respectfully requests that this Court:

a.    Enter an Order which declares that the Mississippi River Commission ("MRC") is subject to the Sunshine Act and/or FACA but has not complied with these Acts' respective open meeting notice, access, and related record-keeping and record-access requirements since approximately 2010.

b.    Issue an Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining Defendant from holding meetings and making recommendations to the U.S. Army Corps of Engineers while it continues to be in violation of the Sunshine Act and/or FACA.

c.    Issue an Injunction and/or Writ of Mandamus requiring the MRC, by and through its officers and U.S. employees, to take appropriate remedial action regarding its failure to comply with the Sunshine

Act and/or FACA, for meetings held from 2010 to present, to include the requirement that the MRC take the following remedial acts:

    i.     Provide public notice of all non-public MRC meetings held since 2010, identifying the topics of such meetings, attendees, presenters, and make available copies of agendas, presentation materials, notes, detailed minutes, or recordings of any non-public MRC meetings.

    ii.    Provide public notice of a record of votes regarding closing MRC meetings since 2010 or a certification that no votes were taken for specific identified non-public meetings.

    iii.   Provide a record of any public certifications of the Chief Legal Officer of the MRC regarding meetings or portions of meetings that were closed to the public since 2010 and the relevant exceptions, along with the filed statement from any meetings' presiding officer setting forth the time and place of the meeting and the persons present. If no such certifications or statements exist, the MRC should provide a statement and/or certification that no such certifications or statements exist.

d.     Issue an Injunction and/or Writ of Mandamus compelling the MRC, by and through its officers and U.S. employees, to comply with the requirements of the Sunshine Act, 5 U.S.C. § 552b(b)-(g), and 33 C.F.R. § 209.50, and/or the provisions of FACA, 5 U.S.C. § 10, including the following:

    i.     Provide timely public notice and public access to all future meetings at which issues of concern to the MRC are to be addressed; such meetings are to include, but not be limited to, what is commonly referred to as the "District Engineer's Brief" or other briefings by District Commanders, technical or policy briefs or presentations by United States Corps of Engineers personnel or other consultants, and meetings at which issues of concern to the MRC, whether raised in public meetings, non-public meetings, or by other means, are discussed, and otherwise fully comply with the Sunshine Act's and FACA's notice, access, and record-keeping requirements.

    ii.    The public notice will include, to the extent practicable, a description of the topics to be addressed in such meetings, consistent with the degree of specificity reflected in the 1977 notice set forth in this Amended Complaint.

      iii.    Maintain audio recordings and transcripts of all meetings and posting and maintaining them on the MRC website for 10 years.

      iv.    Maintain copies of materials for all meetings and posting them on the MRC's website for 10 years. Materials maintained should identify attendees, agendas, presenters, presentations, notes, and minutes from all meetings.

  e.    Award other such relief as is required; and

  f.    Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements.

Dated: January 2, 2025

Respectfully submitted,

*/s/ Don Barrett*
John W. ("Don") Barrett (MSB# 2063)
BARRETT LAW GROUP, P.A.
404 Court Square N
Lexington, Mississippi 39095
Telephone: (662) 834-2488
Facsimile: (662) 834-2628
dbarrett@barrettlawgroup.com

Charles J. LaDuca
(admitted *pro hac vice*)
Mark H. Dubester
(admitted *pro hac vice*)
Jennifer E. Kelly
(admitted *pro hac vice*)
CUNEO GILBERT & LADUCA, LLP
Suite 740
2445 M Street, NW
Washington, DC 20037
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
charlesl@cuneolaw.com
mark@cuneolaw.com
jkelly@cuneolaw.com

*Counsel for Plaintiffs*